# IN THE SUPREME COURT OF IOWA

No. 19–0214

Submitted October 14, 2020—Filed November 13, 2020

**STATE OF IOWA,**

    Appellee,

vs.

**GREGORY MICHAEL DAVIS,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Sean McPartland, Judge.

Defendant convicted of first-degree murder seeks further review of court of appeals decision affirming his conviction. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., and Appel and McDermott, JJ., joined. McDonald, J., filed a dissenting opinion, in which Mansfield and Oxley, JJ., joined.

Alfredo Parrish (argued) and Andrew Dunn of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven (argued), Assistant Attorney General, Jerry A. Vander Sanden, County Attorney, and Elena S. Wolford, Assistant County Attorney, for appellee.

**WATERMAN, Justice.**

The defendant, who had a history of substance abuse and mental illness, killed his girlfriend by stabbing her twenty-six times. A jury convicted him of first-degree murder. In this appeal, we must decide whether a new trial is required because the marshaling instruction for that charge failed to cross-reference the defendant's insanity defense. The defendant's trial counsel failed to object to that omission, even though the marshaling instructions for nine lesser included offenses cross-referenced the insanity defense. New counsel appealed, arguing the defendant's trial counsel provided ineffective representation. We transferred the case to the court of appeals, which affirmed his conviction, stating, "While we encourage trial courts in cases like this to include a reference to an insanity defense in the marshaling instructions, [the defendant] has not shown the result would be different but for the omission." A dissenting judge concluded the inconsistent cross-referencing likely confused the jury and should require a new trial. We granted the defendant's application for further review.

On our review, we determine that this instructional error requires a new trial. Trial counsel breached an essential duty by failing to object. The jury instructions were materially misleading without the cross-reference to the insanity defense in the marshaling instruction for first-degree murder, when that cross-reference was included in all nine of the marshaling instructions for lesser included offenses. The instructional error allowed the jury to conclude the insanity defense didn't apply to first-degree murder. This error undermines our confidence in the verdict. Accordingly, we vacate the decision of the court of appeals, reverse the district court judgment, and remand the case for a new trial.

## I. Background Facts and Proceedings.

The following facts were developed at trial. Gregory Davis had a long history of mental illness and drug abuse dating back to his childhood. Ultimately, he was diagnosed with amphetamine-use disorder with psychosis, major depressive disorder, anxiety disorder, and cannabis-use disorder. Two experts testified in his murder trial that at the time he killed his longtime live-in girlfriend, Carrie Davis, he was experiencing psychosis and lacked the capacity to form criminal intent. Specifically, according to one psychiatrist, Greg believed "that by killing her he would be freeing her of her evil forces and lead to her resurrection and perhaps to life in a better location."

The trial experts relied on his medical and social history. Born with a cleft palate, Greg underwent five extensive facial surgeries between birth and adolescence. He was "paranoid" that "everyone was looking at his face." In his teen years, his family noticed that he experienced "dark periods that would last for different amounts of time." Greg was bullied in school, struggled academically, and developed a mental illness. Greg's substance abuse began in his early teens with alcohol, and escalated to include marijuana, cocaine, methamphetamine, and ecstasy. He became addicted while self-medicating with illegal substances.

Greg graduated from Linn-Mar High School and enrolled at Kirkwood Community College. He was unable to control his addictions and repeatedly entered drug treatment programs. He dropped out of Kirkwood after two semesters.

In 2013, Greg moved to Ohio to work for his brother Jeff's landscaping and home remodeling business. Greg's addictions continued. Jeff noticed that Greg's house was "very dark"; that Greg "did not have great personal skills"; and that Greg had "a lot of paranoia of people

breaking in, stealing things, [and] the government watching." While in Ohio, Greg began dating Carrie. Jeff moved away and left Greg to run the business, which soon failed. In the early summer of 2017, Greg returned home to Marion, Iowa. Carrie left her family, including her children, and moved in with Greg in Iowa. Both Greg and Carrie used meth.

September 28, the date of the murder, was the last day that Greg's mother, Kathy, saw Carrie alive. On September 29, Greg called Kathy and said "Carrie is gone," and he thought Carrie "would wake up when the devil was out of her." On October 1, Greg drove a trailer to the house where his parents lived. Kathy saw rolls of carpet and asked Greg whether Carrie was in the trailer. Greg said that she was. The next day, Kathy contacted the Marion police to request a welfare check on Carrie and told them to look for Carrie at a vacant rental property Kathy owned on Hillview Drive. That same day, Sergeant Terry Kearney conducted a welfare check at the Hillview property, where he saw a trailer in a carport. After moving aside a blanket in the trailer, he saw a foot sticking out. He called for more officers, who secured the scene with him, and eventually Carrie's body was removed. Doctor Jonathan Thompson performed an autopsy and determined that the cause of death was multiple sharp force injuries and that her manner of death was homicide. A toxicology report indicated that Carrie had used meth shortly before her death, and Greg admitted to the police on October 2 that he had used meth around two days earlier, which would have been around the same time.

Tara Scott, a criminalist with the Iowa Division of Criminal Investigation, found a bloodstain in the living room carpet of the house where Greg and Carrie had lived together. A mattress covered the bloodstain, and it appeared as if the blood from the carpet had transferred to the mattress. Carrie's blood was on a sample of carpeting from the

living room and several items of clothing in the house. The carpeting in the basement of the residence had "similar characteristics and color" to the rolls of carpet in the trailer. She also found cleaners in the house and a mop bucket in the garage. There were several notes found in the garage, one of which read:

> Greg Davis is and the spirit of Christ with the powers of the devil and always holds the power of God or the know how and ability and the ability to know how to do anything and everything by praying to himself to do what he or she or everyone or even Greg Davis wants. God can love or hate but not murder. Greg Davis can do anything so is similar to God but can choose to murder if he sees it necessary. God mostly love.

Investigator James Hancox located Greg's truck, a white Ford F-250, outside the Brookside house. The Immediate Response Unit arrived and arrested Greg. Greg had no drug paraphernalia or narcotics on his person. Nothing in Greg's appearance or demeanor indicated he was impaired by alcohol or drugs. Investigators found no illegal drugs or paraphernalia in the house where investigators found Carrie's body or the house where Greg and Carrie lived. Greg seemed "normal" to the officers, was able to communicate with them, and was coherent and responsive to their questions. After officers placed Greg in custody, Officer Bradley Feickert searched the garage at the house where Greg's parents lived and found an extension cord set up like a "makeshift noose or a noose that was attempting to be constructed."

Investigator Hancox searched the Ford and found several knives, bloodstained clothing in a garbage bag in a utility box, and a torn-up note, which he believed—due to singed edges—someone had tried to burn. The note, which had "VOID" written over it, and some words crossed out, read:

> I stabbed Carrie in a vicious attack four days ago when I was on drugs and possessed(?) by what I believe was the devil. I

am truly sorry and apologize to her friends and family. She is in the trailer. She was the love of my life. Greg Davis.

Kathy believed Greg was showing signs of paranoid schizophrenia. She reported his claims that,

They were out to get him. They were bugging his house. They were bugging his car. He couldn't have any piece of electronics in a working condition because there was either a camera or a microphone in it. They were out to get him, to set him up.

At the time of his interview on October 2, however, Greg was "lucid" and "coherent" and did not seem to be under the influence of illegal drugs. During the interview, Greg said:

Q. So I'll turn it over to you for a second. A. I don't know. I recall the possession from the devil once.

Q. When was that? A. I don't know.

Q. You were possessed by the devil once? A. You know, that's what I think, you know, that's the best way I can put it.

Later, Greg said, "There is nothing good about it. She was possessed, as well. I almost felt like she took me over. I don't know how to explain it. I don't want to sound crazy." A few minutes later, he said,

I was scared. I didn't know what to do. I seriously thought there was a connection with her being possessed with the devil, and I didn't know if I needed to go to church. I don't know. I didn't want to take any initiative but it just (inaudible).

In the interview, Greg nodded his head when the officer asked him if he knew what he did was wrong. He also said that while he knew it was wrong, "I just don't feel like I was totally in control of it, honestly." In the interview, he admitted to attempting to hang himself in the garage. Greg later attempted suicide and was placed on suicide watch at the Linn County jail.

The State charged Davis with first-degree murder in violation of Iowa Code sections 707.1, 707.2(1)(*a*), and 902.7 (2017) for the death of Carrie Davis. He filed notice that he intended to rely at trial on defenses of insanity or diminished responsibility. The case proceeded to a five-day jury trial. Prospective jurors were questioned about their views on insanity and diminished capacity through a questionnaire and during voir dire. At trial, two experts, Dr. Arnold Andersen, a psychiatrist, and Dr. Arthur H. Konar, a psychologist, testified as to Greg's mental state. Dr. Andersen said he found Davis "forthcoming and accurate," and Dr. Konar agreed that Davis was telling the truth.

For their evaluations of Davis, Dr. Konar and Dr. Andersen relied on, among other things, interviews with him, his medical records, and Kathy Davis's notes about him. Dr. Konar administered the MMPI-2. He testified it could result in an invalid result for reasons such as inconsistency, someone trying to pretend as if they are better or worse than they actually are, or someone being "at such a level of agitation that they simply can't focus in on the test adequately enough to provide a valid administration." Dr. Konar stated that Greg's test was invalid "because he was so agitated when he was taking the test."

Dr. Andersen testified, "He had the specific intent of killing her. He did not have a specific criminal intent. His understanding was that what he was doing was morally right and necessary." Similarly, Dr. Konar testified that Greg "did not have the ability to form intent" and "did not understand how his behaviors would ultimately affect the individual that he hurt."

Dr. Anderson testified that what Greg had claimed he had experienced appeared to be psychosis, which usually means "hallucinations and delusions, hearing voices that aren't there and having

abnormal beliefs." He also said Greg increased his use of methamphetamine in the year of the alleged crime and stated that methamphetamine use, when it is high dose and long term, could tend to cause an abnormal mental state. He testified that "on the day of this act he was using a heavy dose and continued through about October 1st, if I have my dates correct, at which time he stopped and some clarity of mind returned." He said that a "complete remission" occurs generally nine to twelve months after a person stops using, as long as they don't have any other illnesses. Dr. Konar found that Greg's "addiction dependency on methamphetamine comes from a long-term depression, and his ability to simply stop using was no longer in his control." Ultimately, as Dr. Konar testified, while he and Dr. Andersen agreed that there was a substance-induced psychosis and that Greg did not have the requisite criminal intent, they disagreed as to "whether Gregory Davis could voluntarily have stopped using methamphetamine."

Dr. Gary Keller, a psychiatrist, also evaluated Davis. He agreed that Davis was "genuine." Dr. Keller diagnosed Davis with major depressive disorder, cannabis-use disorder, amphetamine-use disorder with psychosis, and a generalized anxiety disorder. He testified that Davis told him Davis had visions of Jesus and Jesus sitting next to him, "but he acknowledged that was in his mind."

The State and the defense proposed different instructions for Jury Instruction No. 22, the first-degree murder marshaling instruction. There were two key differences: The defense's proposed instruction had a cross-reference to the insanity defense and an element that required the jury to find Davis intentionally killed Carrie. The State's proposed instruction included neither of these. The court accepted the State's proposed instruction as the final instruction and Davis's counsel did not object to

the instruction for failing to cross-reference the insanity defense. Jury Instruction No. 7 told the jury to "consider all the instructions together." Jury Instruction Nos. 14 through 16 discussed the insanity defense. Instruction No. 14 stated:

> The Defendant claims he is not guilty by reason of insanity. You must first determine if the State has proved all the elements of the crime charged beyond a reasonable doubt. If you find the State has proved all the elements, then you must consider the issue of the Defendant's sanity.

None of the instructions for insanity specifically mentioned first-degree murder. By contrast, Jury Instruction No. 17, on diminished responsibility, specifically mentioned first-degree murder: "If you have a reasonable doubt the Defendant was capable of acting deliberately, with premeditation, and the specific intent to kill, then the Defendant cannot be guilty of First Degree Murder. You should then consider the lesser included charges." Each of the marshaling instructions for the nine lesser included offenses expressly cross-referenced the insanity defense, as follows, with little variation: "If the State has proved all the elements, the Defendant is guilty of [the lesser included offense]. You must then consider the defense of insanity as described in Instructions No. 14–18." As noted, those statements were missing from the marshaling instruction for the major offense of first-degree murder.

The prosecutor's closing argument emphasized the first-degree murder instruction: "What this whole case boils down to really is Instruction No. 22." The prosecutor outlined the facts of the case, arguing that Greg's conduct demonstrated he was acting rationally, intentionally, deliberately, and consciously. The State focused on the note that Greg wrote: "There's nothing in this note that he thought he was doing

something good for her or that he was trying to help her or didn't understand what he was doing. He used the phrase 'vicious attack.' "

Davis's counsel began his summation by pointing out the missing element in Instruction No. 22: the "why." Counsel reminded the jury that both experts found Davis lacked "the capacity to form the specific intent to commit a crime" and told the jury that "[i]t's the State's burden to prove that different." He ended by stating, "If you believe those doctors, then it is not murder in the first degree. It's murder in the second degree or not guilty by reason of insanity."

The verdict forms began with "not guilty," and, starting with first-degree murder, included "guilty" verdicts for each charged offense. The thirteenth and final verdict form was "not guilty by reason of insanity." Jury Instruction No. 50 told the jury that "[w]hen you have agreed upon a verdict and the foreperson has signed the verdict form, please notify the Court Attendant." There was no instruction that told the jury to read all of the verdict forms. The jury found Davis guilty of first-degree murder.

Davis retained substitute counsel who moved for a new trial on several grounds, including instructional error. The substitute counsel argued that the court was required to include a reference to Davis's insanity defense in the marshaling instruction for first-degree murder, as it had with all of the lesser included offenses. The district court denied Davis's motion and sentenced him to life in prison.

Davis appealed on multiple grounds, including: (1) the omitted cross-reference to the insanity defense in the first-degree murder marshaling instruction, (2) the inclusion of the intoxication-defense instruction, (3) cross-references to the diminished-responsibility defense in the marshaling instructions for general intent offenses, (4) trial counsel eliciting testimony that he had specific intent to kill Carrie, and (5) the

cumulative effect of these errors violating his right to a fair trial and due process. We transferred the case to the court of appeals, which affirmed Davis's conviction for first-degree murder. As to the first ground, the court of appeals held that Davis failed to establish he suffered prejudice, and as such, it did not need to consider whether his counsel breached an essential duty. A dissenting judge concluded that Davis's trial counsel's performance was deficient and Davis suffered prejudice. Davis applied for further review, and we granted his application.

## II. Standard of Review.

"On further review, we have the discretion to review all or some of the issues raised on appeal or in the application for further review." *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012). In exercising our discretion here, we choose to review only the ineffective-assistance-of-counsel claim regarding the marshaling instruction for first-degree murder. We let the court of appeals decision stand as the final decision regarding the remaining issues. "Our review of claims of ineffective assistance of counsel is de novo." *State v. Ortiz*, 905 N.W.2d 174, 179 (Iowa 2017).

## III. Preservation of Error.

Davis's trial counsel failed to object to the court's Instruction No. 22, which would have provided the court with the opportunity to correct the instruction and avoid another trial. "We have repeatedly held that timely objection to jury instructions in criminal prosecutions is necessary in order to preserve any error thereon for appellate review." *State v. Taggart*, 430 N.W.2d 423, 425 (Iowa 1988).

> [O]ur adversary system imposes the burden upon counsel to make a proper record to preserve error, if any, in this factual circumstance by specifically objecting to instructions in their final form, requesting instructions and voicing specific exception in event they are refused.

*State v. Sallis*, 262 N.W.2d 240, 248 (Iowa 1978). Davis failed to preserve error because his trial counsel did not object to the final draft of Instruction No. 22.

**IV. Analysis.**

"The constitutions of the United States and Iowa guarantee a criminal defendant the right to effective assistance of counsel." *State v. Kuhse*, 937 N.W.2d 622, 628 (Iowa 2020). A defendant proves ineffective assistance of counsel when he establishes: "(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice." *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

When error regarding jury instructions is preserved, we presume prejudice. *See State v. Lorenzo Baltazar*, 935 N.W.2d 862, 871 (Iowa 2019). By contrast, "an ineffective-assistance-of-counsel claim based on failure to preserve jury instruction error must demonstrate deficiency and prejudice." *Id.* at 871–72. Because Davis's counsel failed to preserve error on his challenge to the marshaling instruction, he must establish both deficiency (failure to perform an essential duty, that is, breach) and prejudice.

We begin with whether Davis's attorney failed to perform an essential duty. Davis bears the burden of proving that his counsel "performed below the standard demanded of a reasonably competent attorney." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001) (en banc). We presume Davis's counsel "performed competently," and "we scrutinize each claim in light of the totality of the circumstances." *Id.*

In *State v. Ondayog*, we noted "the failure to recognize an erroneous instruction and preserve error breaches an essential duty." 722 N.W.2d 778, 785 (Iowa 2006). "The question becomes whether there was a tactical reason for not objecting to the instruction." *Id.* Whether such a reason

existed is determined based on "the perspective of when the decision was made—during the course of trial." *Id.* We concluded that Ondayog's counsel's failure to object could be trial strategy because it meant that the jury was instructed on a lesser crime, which "would give the jury the opportunity to forego the three higher offenses." *Id.* at 786.

By contrast, in *State v. Harris*, we held that counsel breached a duty because there was "no possible strategic reason for failing to object" to an erroneous marshaling instruction that omitted the "going" element from the crime of going armed with intent. 891 N.W.2d 182, 186–87 (Iowa 2017). Similarly, we see "no possible strategic reason" for Davis's trial counsel to fail to object to the omitted cross-reference. The uniform jury instruction for the insanity defense has a comment that states, "If the insanity defense is submitted, then the marshaling instruction should be modified accordingly." Iowa State Bar Ass'n, Iowa Criminal Jury Instruction 200.9 cmt. (2019). "As we have noted in the past, 'trial courts should generally adhere to the uniform instructions.'" *State v. Becker*, 818 N.W.2d 135, 143 (Iowa 2012) (quoting *State v. Mitchell*, 568 N.W.2d 493, 501 (Iowa 1997)), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016). Indeed, Davis's trial counsel proposed a marshaling instruction for first-degree murder with this cross-reference, and this cross-reference was included in all nine marshaling instructions for the lesser included offenses. Nevertheless, trial counsel failed to object when the final marshaling instruction for first-degree murder omitted this cross-reference. In our view, this failure to object breached an essential duty. We see no tactical reason for not including the cross-reference; in fact, failing to object contradicted the attorney's previous request to include it.

We turn to the second prong of the analysis, whether Davis suffered prejudice due to his attorney's breach. The defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984).

"We presume juries follow the court's instructions." *State v. Hanes*, 790 N.W.2d 545, 552 (Iowa 2010). "Jury instructions are not considered separately; they should be considered as a whole." *State v. Fintel*, 689 N.W.2d 95, 104 (Iowa 2004).

> Litigants are entitled to have their legal theories submitted if those theories are supported by the pleadings and substantial evidence in the record. Moreover, the court's instructions must convey the applicable law in such a way that the jury has a clear understanding of the issues it must decide.

*Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997) (citation omitted); *see also State v. Benson*, 919 N.W.2d 237, 245–46 (Iowa 2018) (determining there was prejudice because of "confusing and misleading" jury instructions).

In *Harris*, we held that trial counsel was ineffective for failing to object to an erroneous marshaling instruction. 891 N.W.2d at 189. Harris had been arguing with another patron inside a bar and both were told to leave. *Id.* at 184. Harris left first and waited outside, where he attacked the other man with a knife. *Id.* He was convicted of going armed with intent. *Id.* On appeal, he argued the evidence of movement was insufficient and that his trial counsel was ineffective in failing to object to omission of the "going" (movement) element in the marshaling instruction. *Id.* at 184–85. In determining *Strickland* prejudice, "we consider[ed]

whether our confidence in the outcome of Harris's trial [was] undermined by omission of the element of movement in [the marshaling instruction]." *Id.* at 189. While "substantial evidence supported a finding of movement sufficient to uphold Harris's conviction," we stated "that conclusion does not control our determination of whether prejudice flowed from the flawed marshalling instruction." *Id.* We held that Harris suffered *Strickland* prejudice and that a new trial was required "because the evidence of Harris's movement was not great and the flawed marshalling instruction did not require the jury to make a finding on that element of the crime." *Id.* We reach the same conclusion here. Our confidence in the verdict is undermined when the key marshaling instruction fails to address the central issue in the trial: Davis's sanity.

In *State v. Kuhse*, the defendant was convicted of domestic abuse assault causing bodily injury. 937 N.W.2d at 624. He appealed, arguing his trial counsel was ineffective for failing to object to the marshaling instruction that omitted language that "the State needed to prove the act was done without justification." *Id.* The court of appeals reversed his conviction, "reasoning that failure to include 'lack of justification' in the marshaling instruction was prejudicial for ineffective-assistance purposes, regardless of the strength of the State's case and the fact that the subject had been covered elsewhere in the instructions." *Id.* On further review, we vacated the court of appeals decision and affirmed his conviction because,

> [i]n our view, considering the evidence and the instructions as a whole, we do not believe there was a reasonable probability of a different outcome if justification had been covered in the marshaling instruction in addition to the other instructions.

*Id.* The justification defense instructions immediately followed the marshaling instructions covering the major and lesser included offenses.

*Id.* at 630. Moreover, the first instruction on the justification defense said, "The State must prove the Defendant was not acting with justification." *Id.* And factually, we observed the defense seemed "implausible." *Id.*

The evidence showed the self-defense theory was indeed implausible. The victim was Kuhse's wife of nine years. *Id.* at 624. Kuhse was in the basement drinking with friends when the victim went downstairs to do laundry and they began arguing after he called her names. *Id.* Kuhse "strangled [her] to the point that she could not breathe" while she swiped at him to loosen his grip. *Id.* at 624–25. He "finally let her go but caught her as she fell and slammed her against the wall," and then slammed her "toward the entertainment center," and finally slammed her "against the coffee table." *Id.* at 625. She called the police, who observed her injuries—"bruises, abrasions, and scratches on her knees, neck, and arm." *Id.* When police told her to go to the hospital by ambulance, she balked at the cost and had a friend take her. *Id.* Kuhse told police he acted in self-defense. *Id.* He had a scratch on his nose and a bruise on his arm, and told the police he got the injuries from her "bumping into him" and "throwing herself onto his arm." *Id.* She was five feet, two inches tall and 105 pounds; he was five feet, nine inches tall and 190 pounds. *Id.* Photographs showed her "injuries were much more significant" than his and matched her testimony. *Id.* at 630.

Davis argues our analysis in *Kuhse* supports reversal of his conviction. *Kuhse* provides the governing test for determining *Strickland* prejudice in this context:

> In sum, . . . ineffective assistance of counsel does not necessarily occur when defense counsel fails to object that a marshaling instruction does not refer to a required element of a defense—or cross-reference a defense that the State is required to disprove. Instead, one must examine the record

> and consider the evidence presented, how the case was tried, and what the jury instructions as a whole said.

*Id.* Our analysis of prejudice considered how the parties used the jury instructions in their closing arguments. *Id.* Applying *Kuhse*, we conclude Davis has established *Strickland* prejudice. The difference in outcomes is explained by key differences in the instructions and evidentiary record.

First, we review the jury instructions as a whole. *Id.* Each of the marshaling instructions for the nine lesser included offenses cross-referenced Davis's insanity defense. Not so in *Kuhse*. As the dissenting judge on the court of appeals in this case concluded, upon seeing the insanity defense specifically mentioned in the nine lesser included instructions but not in Instruction No. 22, jurors would understand that the defense did not apply to first-degree murder.[1] And as Davis's appellate counsel argued, "the jury would logically believe there was something unique about the 'defense of insanity' when it came to first-degree murder,

---

[1]The dissenting judge mentioned a canon of statutory construction, *expressio unius est exclusio alterius*, which shows how jurors might interpret this set of instructions, stating,

> Presumably we apply this maxim because it makes logical sense. Although the jurors were obviously not instructed on this maxim, the idea behind it would make a reasonable juror conclude the omission of the reference to the defenses meant they did not apply.

Indeed, we have observed "the legislature's selective inclusion of [a] phrase . . . to be dispositive." *Oyens Feed & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 194 (Iowa 2011); *see also Chesnut v. Montgomery*, 307 F.3d 698, 701 (8th Cir. 2002) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983))); *Freedom Fin. Bank v. Estate of Boesen*, 805 N.W.2d 802, 812 (Iowa 2011) (same). The same principle applies here. When the marshaling instructions for the other nine offenses cross-referenced the insanity defense but not the instruction for first-degree murder, the jurors would reasonably conclude that omission was intentional and the defense was unavailable.

and that insanity did not apply to it." We agree, and conclude the instructions, read as a whole, are materially misleading.[2]

Second, in our view, Davis's insanity defense is stronger than Kuhse's "implausible" justification defense. Davis had the burden to prove insanity by a preponderance of the evidence. Iowa Code § 701.4; *Becker*, 818 N.W.2d at 142. Two medical experts testified that Davis lacked the requisite criminal intent for first-degree murder.[3] Davis has a long history of methamphetamine abuse, which both Dr. Konar and Dr. Andersen testified can lead to a substance-induced psychosis. Indeed, both agreed that Davis was under this psychosis. The day after the murder, Davis told his mother that he thought Carrie "would wake up when the devil was out of her." The way he described himself indicated he was not of a sound mind. He claimed he was "similar to God but can choose to murder if he sees it necessary" and that he was "the spirit of Christ with the powers of the devil."

Sanity is judged at the time of the offense. The State relies, in part, on after-the-fact evidence such as Davis's sobriety and demeanor several days later as well as his effort to clean up the crime scene. Davis rolled

---

[2]Moreover, the jury's first-degree murder verdict, which shows it rejected Davis's diminished capacity defense, does not mean the jury would not have found him insane. Insanity and diminished capacity are separate concepts with separate instructions. The diminished capacity instruction expressly mentioned first-degree murder, while the insanity instruction merely referred to "the crime charged."

[3]The State's position is not supported by *Lamasters v. State*, 821 N.W.2d 856 (Iowa 2012). There, in finding no *Strickland* prejudice, we stated: "[W]e cannot find a reasonable probability on this record that an insanity defense would have been successful. No expert has opined that Lamasters was legally insane at the time of the killing." *Id.* at 868. Nor is the State's position supported by *State v. Buck*, 510 N.W.2d 850, 853–54 (Iowa 1994) (holding defendant was not prejudiced by his trial counsel's failure to preserve error as to his waiver of a jury trial on the insanity defense). Buck relied solely on lay-witness testimony for his insanity defense and the State's expert testified that at the time of the killing, "Buck understood the nature and quality of his acts, could distinguish right from wrong, and could form a specific intent to kill." *Id.* at 851–52. Those cases are readily distinguishable because Davis supported his insanity defense with expert testimony.

up Carrie's body in blankets and carpet and placed bloodstained clothes in a garbage bag. Davis also placed a mattress over the bloodstain in the living room to cover it and wrote a note confessing to "stabb[ing] Carrie in a vicious attack," all of which the State argued were evidence showing he knew what he did was wrong. Additionally, officers found no drugs or paraphernalia on Davis, who was lucid and coherent four days after he killed Carrie. On balance, the question of Davis's sanity was for the jury to decide, under proper instructions.

Third, as in *Kuhse*, we consider how the parties argued the jury instructions in summation. 937 N.W.2d at 630. "The marshaling instruction is the crown jewel of the court's instructions in a criminal case." *Id.* at 633 (Appel, J., concurring specially). The State's closing argument focused on Instruction No. 22: "What this whole case boils down to really is Instruction No. 22." The prosecutor displayed Instruction No. 22 for the jury on a PowerPoint slide. In the rebuttal argument, the prosecutor said, "And what I'd argue to you is that after you consider the elements of first degree murder, you don't go any further. That's it." Indeed, the jury returned a verdict for first-degree murder, and stopped.

Davis's trial counsel provided ineffective assistance when he failed to object to the trial court's departure from the uniform jury instructions that would cross-reference the insanity defense in the marshaling instruction for first-degree murder. This significant error in the marshaling instruction for the main offense undermines our confidence in the verdict. Trial counsel's breach and the resulting prejudice require a new trial.

## V. Disposition.

For these reasons, we vacate the decision of the court of appeals, reverse the district court judgment, and remand the case for a new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

All justices concur except McDonald, J., Mansfield, and Oxley, JJ., who dissent.

**McDONALD, Justice (dissenting).**

Lest there be any doubt, the defense presented its insanity defense to the charge of murder in the first degree, the jury considered the same, and the jury rejected it. From defense counsel's first words to the jury in his opening statement—

> I thought she was the devil. I thought that I was the devil. I thought I was Jesus and I thought I was God. I thought she was going to be resurrected and saved. I wrapped her body like they did Christ. Voices in my head told me I was doing the right thing. I was doing her a favor. I figured she had to be covered out of respect. This is what Greg Davis thought. *These are not the thoughts of a sane man.*

—through defense counsel's final words to the jury in his closing statement—

> The only way you convict Greg Davis of murder in the first degree is if you don't believe both of those doctors. *If you believe that both of those doctors are wrong, then it's murder in the first degree.* I submit to you the State has produced no evidence to dispute that either of those doctors are wrong.
>
> . . . .
>
> That's why we have experts, to help us -- to help explain to us. *Again, if you don't believe either of those doctors, that's the only way you're going to get a murder first degree. If you believe those doctors, then it is not murder in the first degree.* It's murder in the second degree or not guilty by reason of insanity.

—Davis's insanity defense was squarely and unequivocally presented to the jury. (Emphasis added.) The majority nonetheless concludes the jury might not have understood the insanity defense applied to murder in the first degree because the marshaling instruction for murder in the first degree lacked a cross-reference to the insanity instructions. This is contrary to the relevant law, the record, and common sense. I respectfully dissent.

To establish his claim of ineffective assistance of counsel, Davis was required to establish his trial counsel failed to perform an essential duty and trial counsel's breach of duty resulted in constitutional prejudice. *See State v. Walker*, 935 N.W.2d 874, 881 (Iowa 2019). To establish constitutional prejudice, Davis was required to show counsel's performance caused a complete "breakdown in the adversary process" such that the result of the trial was unreliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S. Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691, 104 S. Ct. at 2066.

This court resolved the question presented in this case in the materially indistinguishable case of *State v. Kuhse*, 937 N.W.2d 622 (Iowa 2020). In that case, the defendant was charged with domestic abuse assault causing bodily injury. *See Kuhse*, 937 N.W.2d at 625. The defendant asserted a justification defense. *See id.* at 626. The marshaling instruction did not cross-reference the defense, and counsel did not object to the omitted cross-reference. *See id.* at 625–26, 627. The jury found the defendant guilty as charged. *See id.* at 627. In reviewing the unpreserved error, we applied the *Strickland* prejudice standard. *See id.* at 628. We explained *Strickland* required "us to consider the totality of the evidence, identify what factual findings would have been affected, and determine if

the error was pervasive or isolated and trivial." *Id.* at 628 (quoting *State v. Ambrose*, 861 N.W.2d 550, 557–59 (Iowa 2015)). We further explained,

> ineffective assistance of counsel does not necessarily occur when defense counsel fails to object that a marshaling instruction does not refer to a required element of a defense— or cross-reference a defense that the State is required to disprove. Instead, one must examine the record and consider the evidence presented, how the case was tried, and what the jury instructions as a whole said.

*Id.* at 630.

We ultimately concluded the defendant did not carry his burden to "establish *Strickland* prejudice." *Id.* at 631. In reaching that conclusion, we explained Kuhse's justification defense was weak. *See id.* at 630–31. We also noted there was little risk the jury did not understand justification was at issue. *Id.* at 631. Justification was the "focal point" of the case and closing arguments. *See id.* at 630. The fact that justification was the focal point of the case "helped confirm for the jury that justification was an essential part of its deliberations." *Id.* Further, we explained the jury instructions as a whole made clear that justification was at issue and had to be considered. *See id.* Those considerations showed there was no "reasonable probability of a different outcome if the marshaling instruction on domestic abuse assault causing bodily injury had included or cross-referenced lack of justification." *Id.* at 631.

Those same three considerations control the disposition of this case. First, as in *Kuhse*, the defendant's insanity defense was weak. The jury was instructed Davis needed to prove by a preponderance of the evidence either of the following:

> 1. At the time the crime was committed, the Defendant suffered from such a diseased or deranged condition of the mind as to render him incapable of knowing the nature and quality of the acts he is accused of; or

> 2. At the time the crime was committed, the Defendant suffered from such a diseased or deranged condition of the mind as to render him incapable of distinguishing between right and wrong in relation to the act.

"[T]he jury instructions become the law of the case for purposes of our review of the record." *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009).

A point of procedure makes Davis's defense weaker—and his claim of constitutional prejudice necessarily weaker—than that presented in *Kuhse*. In *Kuhse*, the defendant presented an affirmative defense of justification. A defendant asserting a justification defense "bears the initial burden of producing sufficient evidence to support the instruction. Once that threshold is met, the burden shifts to the State to prove lack of justification beyond a reasonable doubt." *Kuhse*, 937 N.W.2d at 628 (citation omitted). Here, however, the burden of proof was on Davis. It was his burden to prove his insanity defense by a preponderance of the evidence. *See* Iowa Code § 701.4 (2017); *State v. James*, 393 N.W.2d 465, 466–67 (Iowa 1986) (en banc) (rejecting federal and state due process challenges to the statute).

The record shows Davis failed to prove he did not know the nature and quality of his acts or was incapable of distinguishing between right and wrong. Davis undertook deliberate, methodical, and calculated action to cover up the murder. This demonstrates he understood both the nature of his acts and his acts were wrong. *See Lamasters v. State*, 821 N.W.2d 856, 867–69 (Iowa 2012) (holding there was no reasonable probability an insanity defense would have been successful when the defendant lied about the murder victim's whereabouts to suggest she was still alive); *State v. Jacobs*, 607 N.W.2d 679, 685 (Iowa 2000) (holding that the trial court's rejection of an insanity defense was supported by evidence the defendant used "intricate transactions" to cover up his theft); *State v. Hamann*, 285

N.W.2d 180, 184 (Iowa 1979) (en banc) (holding right or wrong under the insanity test refers to "legal right or wrong"); *see also State v. Crenshaw*, 659 P.2d 488, 497 (Wash. 1983) (en banc) ("Such attempts to hide evidence of a crime manifest an awareness that the act was legally wrong.").

Here, shortly after brutally killing Carrie, Davis tried to hide her body. He wrapped Carrie's body in a sheet and several blankets. He then rolled her body into a roll of carpet. He put her body in the back of his trailer next to another rolled up carpet. He then drove the trailer first to his parents' house and then later to one of their vacant rental properties, where he parked the trailer under a carport hidden from sight. The defendant's attempts to hide Carrie's body manifested his understanding of both the nature and wrongfulness of his conduct. *See State v. Buck*, 510 N.W.2d 850, 851, 853–54 (Iowa 1994) (holding no prejudice in waiving jury trial where defendant hid the body of the decedent and a reasonable jury would have found him guilty of first-degree murder despite the weak insanity defense); *see also Alvelo v. State*, 724 S.E.2d 377, 382 (Ga. 2012) (rejecting defendant's contention he proved insanity defense where evidence showed defendant's "efforts to . . . hide the body indicated [defendant] knew the wrongfulness of his actions"); *Crenshaw*, 659 P.2d at 497 (stating defendant's attempt to hide body manifested his awareness his crime was wrong).

The evidence also showed Davis took deliberate action to clean up the crime scene. After Davis killed Carrie, Davis placed his bloodstained clothing near the washer and dryer. A garbage bag in the bed of his truck contained damp clothing with apparent bloodstains and a paper towel with similar stains. Inside the residence, Davis moved a mattress to cover a bloodstained carpet. Davis's attempts to clean up the crime scene are inconsistent with his insanity defense. *See Alvelo*, 724 S.E.2d at 382

(rejecting defendant's contention he proved insanity defense where evidence showed defendant's "efforts to clean up the blood . . . indicated [defendant] knew the wrongfulness of his actions"); *Crenshaw*, 659 P.2d at 497 (holding defendant's efforts to "clean up the blood" from crime scene "manifest[ed] an awareness that the act was legally wrong").

Davis also acknowledged the wrongfulness of his conduct. He handwrote a note in which he admitted his conduct. In the note, he did not claim he did not understand what he had done to Carrie. Instead, he wrote he "was on drugs." In the note, he confessed he killed Carrie in a "vicious attack." In the note, Davis apologized to Carrie's family and friends and demonstrated he understood what he had done and that it was wrong. Davis's expressions of remorse are inconsistent with his insanity defense. *See Frost v. State*, 453 So.2d 695, 698 (Miss. 1984) ("Actual expressions of remorse such as the ones at issue here would be probative of whether a Defendant knew the difference between right and wrong at the time he committed the crimes.").

Davis's interview with police also strongly undercuts his insanity defense. One officer testified Davis's demeanor was normal at the time the police took him into custody. He was able to communicate with officers without any problem. During his interview with the police, Davis was coherent, lucid, and able to respond to questions. The defendant's lucidity during the interview cuts against his insanity defense. *See Choisnet v. State*, 761 S.E.2d 322, 324, 326 (Ga. 2014) (holding defendant failed to prove insanity defense where, among other things, the defendant was "lucid and gave no indication of delusional thinking" during police interview).

Given Davis's conduct upon being taken into custody and during the police interview, Davis's evidence showed, at best, Davis experienced

a temporary methamphetamine-induced psychosis. During Davis's evaluation with Dr. Arnold Andersen at the Iowa Medical and Classification Center, Davis admitted to using methamphetamines around the time he killed Carrie. Dr. Andersen testified Davis's drug use was voluntary. Davis's voluntary drug use does not support his defense. "Voluntary temporary intoxication does not excuse one for the criminal consequences of his conduct." *State v. Booth*, 169 N.W.2d 869, 873 (Iowa 1969). "[T]emporary insanity which arises from present voluntary intoxication is not [a] defense[] . . . even though the defendant's temporary state of mind may meet the requirements of legal insanity contained in the M'Naghten rule . . . ." *Id.* (quoting 21 Am. Jur. 2d *Criminal Law* § 44, at 128 (1969)).

Davis's defense was further undermined by his own witness. Davis called Dr. Andersen to testify. Upon questioning by defense counsel, Dr. Andersen testified Davis had the specific intent to kill Carrie. Dr. Andersen's testimony regarding Davis's intent to kill was so damaging to the defendant's case that Davis claims in this appeal that his counsel was ineffective for eliciting the testimony.

Second, as in *Kuhse,* there was no risk of juror confusion here because one of the focal points of the case was Davis's insanity defense. In this case, from the outset—even prior to the jury being empaneled—the prospective jurors were informed this case was about Davis's insanity defense. Question No. 7 of the juror questionnaire stated the "[d]efendant has asserted a defense of insanity/diminished responsibility. . . . Does the fact that this defense is asserted affect your ability to decide this case fairly and impartially on the evidence presented and the law as stated by the Judge?" Each juror then provided responses in the questionnaire

regarding their view of the insanity defense for the lawyers to use during voir dire.

During voir dire, defense counsel implanted in the minds of the jurors the centrality of the insanity defense. Defense counsel asked the prospective jurors about their opinions on "mental health, psychiatrists, psychologists, [and] mental health professionals." He asked the prospective jurors about their respective experience with health care professionals and whether that would have an effect on their ability to listen to the testimony of the defendant's professionals and experts. He asked the prospective jurors whether any knew of a person who had a mental health issue and whether that would impact their ability to serve. He asked the prospective jurors directly if they could "find someone not guilty by reason of insanity" if the evidence supported it. The following exchange is just an example:

> COUNSEL: One of the other questions on the questionnaire we talked about, diminished responsibility and insanity. If there was evidence—I'm going to stick with you, Ms. Hasek—evidence that supports it, could you find someone not guilty by reason of insanity?

> PROSPECTIVE JUROR HASEK: If evidence was there to support it, yes.

> COUNSEL: Okay. Obviously there's a standard, and if we supported it, you would be okay with that?

> PROSPECTIVE JUROR HASEK: Yes.

> COUNSEL: Mr. McShane?

> PROSPECTIVE JUROR McSHANE: Yes.

> COUNSEL: How are you?

> PROSPECTIVE JUROR McSHANE: Good.

> COUNSEL: Good. Same question. If the evidence supported it, could you vote not guilty by reason of insanity?

PROSPECTIVE JUROR McSHANE: Yes.

COUNSEL: Thank you.  Mr. Taylor?

PROSPECTIVE JUROR TAYLOR: Yes.

COUNSEL: Same question.  If the evidence supported it, could you vote not guilty by reason of insanity?

PROSPECTIVE JUROR TAYLOR: Yes.

COUNSEL: Ms. Brecht, same question.

PROSPECTIVE JUROR BRECHT: Yes.

COUNSEL: Okay.  Thank you.  Mr. Allen?

PROSPECTIVE JUROR ALLEN: Yes.

COUNSEL: Same question.

PROSPECTIVE JUROR ALLEN: Yes.

COUNSEL: If the evidence supported it, you could vote not guilty by reason of insanity?

PROSPECTIVE JUROR ALLEN: Yes.

COUNSEL: Mr. Tijerina?

PROSPECTIVE JUROR TIJERINA: Pretty close.

COUNSEL: Pretty close.  Okay.  We just met not long ago.  The same question.  If the evidence supported it, could you vote not guilty by reason of insanity?

PROSPECTIVE JUROR TIJERINA: I could, yes.

Defense counsel repeated this same line of questioning with other prospective jurors as well.

The conduct of the trial further cemented in the jury's collective mind that a focal point of the case was Davis's insanity defense.  During opening statements, the prosecutor directly addressed the issue.  As noted above, the very first words out of defense counsel's mouth involved Davis's sanity.  Defense counsel framed the entire case around this issue:

> You're going to receive an instruction on whether or not the defendant was insane during the time of this crime. . . . Insanity means such a diseased and deranged condition that someone cannot tell right from wrong. Greg Davis did not believe he was doing wrong at this time.

Defense counsel then explained to the jury the centrality of the insanity defense to the case. He said the State is "going to try to prove to you that [Davis] didn't have any mental health issues, that he was not insane when this incident occurred. But that cannot be the case." Defense counsel told the jury about the delusional thoughts Davis allegedly had at the time of the crime, such as seeing Jesus and the devil, and said, "These are not the thoughts of a sane man." Defense counsel then explicitly asked the jury to return a verdict of not guilty by reason of insanity:

> We have to prove to you beyond—we have to prove to you by a preponderance of the evidence that Gregory Davis was insane during the time of this incident. When the evidence is before you, that will not be a difficult conclusion to come to. Preponderance of the evidence is a different standard than beyond a reasonable doubt. Preponderance of the evidence is the lowest standard of the law. It is the easiest burden to prove. It means that it was more likely than not that Greg Davis was insane at the time of this crime.

> We're not asking you to excuse him because he was voluntarily on meth, as the State would have you believe. We are asking you to recognize that Greg was under an involuntary psychosis and that this is the law that will be presented to you. It is your obligation to interpret the evidence as such. We believe that this evidence will be so compelling, and that is why you are going to return a verdict of not guilty by reason of insanity

The centrality of the insanity defense continued through trial and closing argument. "This helped confirm for the jury that [the insanity defense] was an essential part of its deliberations." *Kuhse*, 937 N.W.2d at 630. Davis presented his insanity defense through the opinion testimony of Dr. Konar and Dr. Andersen. Relying on their testimony, defense

counsel directly addressed the issue in his closing argument, stating the prosecutor

> put up there the elements of murder one . . . . One of the elements that he did not address which has been the core of this case since we started—we talked about it from voir dire, opening statement. It was never a whodunit. It was a why.

Defense counsel continued, explicitly tying the doctor's testimony regarding Davis's sanity to the charge of murder in the first degree:

> The only way you convict Greg Davis of murder in the first degree is if you don't believe both of those doctors. If you believe that both of those doctors are wrong, then it's murder in the first degree. I submit to you the State has produced no evidence to dispute that either of those doctors are wrong.
>
> . . . .
>
> That's why we have experts, to help us—to help explain to us. Again, if you don't believe either of those doctors, that's the only way you're going to get a murder first degree. If you believe those doctors, then it is not murder in the first degree. It's murder in the second degree or not guilty by reason of insanity.

The prosecutor directly responded and argued the evidence showed Davis was "not a man who has taken leave of his senses. This is not a man who has lost touch with reality. He is as sane as rain." The prosecutor asked the jury to thus return a verdict of guilty of murder in the first degree.

The centrality of the insanity defense throughout the entire proceeding—from jury selection, through opening statement, through the presentation of evidence, and through closing argument—would be a sufficient basis, standing alone, to conclude Davis failed to carry his affirmative burden of establishing *Strickland* prejudice.

Third, as in *Kuhse*, Davis's showing of *Strickland* prejudice is undermined by the jury instructions given in this case. When this court evaluates claims involving instructional error, the court should not "parse particular phrases" but should "look at the instructions as a whole in light

of the relevant standard of review." *Booker v. Mass. Dep't of Pub. Health*, 612 F.3d 34, 44 (1st Cir. 2010); *see State v. Fintel*, 689 N.W.2d 95, 104 (Iowa 2004) ("Jury instructions are not considered separately; they should be considered as a whole.").

Here, the jury was instructed it should consider all of the instructions together as a whole. The district court read preliminary instructions to the jury. The preliminary instruction stated, "The jury will be instructed to consider all of the instructions together. No one instruction includes all of the applicable law." Jury Instruction No. 7 told the jury to consider all of the instructions together: "You must consider all of the instructions together. No one instruction includes all of the applicable law."

The instructions given here, when considered as a whole, make clear the jury was to consider Davis's insanity defense with respect to the charge of murder in the first degree. Jury Instruction No. 14 set forth the jury's duty to consider the insanity defense with respect to the crime charged:

> The Defendant claims he is not guilty by reason of insanity. You must first determine if the State has proved all the elements of the crime charged beyond a reasonable doubt. If you find the State has proved all the elements, then you must consider the issue of the Defendant's sanity.

Jury Instruction Nos. 15 and 16 made clear the jury should consider Davis's insanity defense. Jury Instruction No. 15 provided: "The defendant claims he is not criminally responsible for his conduct by reason of insanity. A person is presumed sane and responsible for his acts." Jury Instruction No. 16 provided: "If the State has proved all the elements of a crime, you should then determine if the Defendant has proved he was insane." Notably, Jury Instruction No. 16 provided the jury should consider the insanity defense if the State proved all the elements of "a

crime," meaning any crime charged, without limitation. *See Am. Bus Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (quoting *Brooks v. Zabka*, 450 P.2d 653, 655 (Colo. 1969) (en banc))).

The majority attempts to distinguish *Kuhse* on the ground the risk of confusion is greater here because the marshaling instruction for murder in the first degree failed to cross-reference Davis's defense of insanity while the lesser included offense instructions did cross-reference Davis's defense of insanity. The majority's purported distinction does not hold for two reasons: the majority's distinction rests on the wrong legal standard, and the majority's distinction is contrary to the record and common sense.

The majority's purported distinction rests on the wrong legal standard. While the majority cites *Strickland* and purports to apply the *Strickland* prejudice standard, it actually applies some sort of presumed-prejudice standard for preserved error. *See Kuhse*, 937 N.W.2d at 629 ("A 'presumed-prejudice standard applies to preserved errors in jury instructions.' However, 'an ineffective-assistance-of-counsel claim based on failure to preserve jury instruction error must demonstrate deficiency and prejudice.'" (Citation omitted) (quoting *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 871–72 (Iowa 2019)).). Under this new standard, the majority concludes Davis established prejudice because the jury instruction undermines the majority's confidence in the verdict. However, this is not the relevant standard under *Strickland*. Under *Strickland*, Davis must show "a reasonable probability that the result of the trial would have been different. The likelihood of a different result must be substantial, not just

conceivable." *Ambrose*, 861 N.W.2d at 557 (citation omitted).[4]  Nowhere

does the majority conclude, as *Strickland* and *Kuhse* require, that Davis

established a reasonable probability the result of the trial would have been

different.

Not only does the majority opinion apply the wrong legal standard,

its erroneous standard leads the majority to misapprehend and understate

the value citizen jurors bring to the administration of criminal justice.

> [T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence.

*Williams v. Florida*, 399 U.S. 78, 100, 90 S. Ct. 1893, 1906 (1970).  Jurors

are serious-minded in taking the oath.  Jurors discharge their civic duty

with the seriousness and earnestness the occasion demands.  Jurors

"undertake[] deliberations that are honest, candid, robust, and based on

common sense." *Peña-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct.

855, 861 (2017).  The application of common sense in the administration

of justice is one of the central values of the jury system:

> One of the main objects of a jury trial is to secure to parties the judgment of 12 men of average intelligence, who will bring to bear upon the consideration of the case the sound common sense which is supposed to characterize their ordinary daily transactions.  If cases were to be decided alone by the application of technical rules of law and evidence, it could better be done by men who are learned in the law, and who

---

[4]This is the showing required to establish *Strickland* prejudice with respect to all unpreserved claims of instructional error.  *See Lorenzo Baltazar*, 935 N.W.2d at 872 (finding that even where there was outdated language within the jury instruction, the defendant could not show prejudice due to the overwhelming evidence against him); *Ambrose*, 861 N.W.2d at 557–59 (deciding there was no ineffective assistance of counsel when defense counsel failed to object to an instruction that told the jury not to consider lesser included offenses until it had acquitted the defendant of the greater offense); *State v. Propps*, 376 N.W.2d 619, 623–24 (Iowa 1985) (holding the defendant failed to establish prejudice where the omission of a knowledge element from marshaling instruction was cured by other instructions).

> have made it the study of their lives; and while it is entirely true that the jury are bound to receive the law from the court, and to be guided by its instructions, it by no means follows that they are to abdicate their common sense, or to adopt any different processes of reasoning from those which guide them in the most important matters which concern themselves. Their sound common sense, brought to bear upon the consideration of testimony, and in obedience to the rules laid down by the court, is the most valuable feature of the jury system, and has done more to preserve its popularity than any apprehension that a bench of judges will willfully misuse their power.

*Dunlop v. United States*, 165 U.S. 486, 499–500, 17 S. Ct. 375, 380 (1897).

The jury brings this collective common sense to reading, understanding, and applying the jury instructions.

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. 370, 380–81, 110 S. Ct. 1190, 1198 (1990). The jury is not composed of technocrats who apply arcane Latin maxims of statutory construction to parse jury instructions.

Other courts applying the *Strickland* prejudice standard have recognized the strength and value of the jury system and reached the same conclusion this court reached in *Kuhse*:

> Upon this record, [there is] little potential for the jury being misdirected sufficiently to cause a miscarriage of justice when all the instructions are read together, especially in light of the lengthy record in which substantially all the evidence focused on a single defense. Reading the instructions together in the light of the facts here presented, no reasonably attentive and intelligent juror could have been misled or confused by the failure to include [a cross reference in the marshaling instruction].

*State v. Howard*, 896 S.W.2d 471, 484 (Mo. Ct. App. 1995) (citation omitted); *see also Patterson v. State*, 576 S.W.3d 240, 246 (Mo. Ct. App.

2019) (holding defendant failed to establish *Strickland* prejudice due to omission of cross-reference to defense in instructions where the instructions as a whole referenced the defense); *Wright v. State*, 125 S.W.3d 861, 867 (Mo. Ct. App. 2003) (holding defendant failed to establish *Strickland* prejudice due to lack of cross-reference to defense in instructions where "trial counsel explained the concepts of self-defense and defense-of-another in his closing arguments to the jury," and "the trial court instructed the jury on justification"). I would follow *Kuhse* and the persuasive authority.

The defendant is entitled to a fair trial, not a perfect one. *See State v. Webster*, 865 N.W.2d 223, 233 (Iowa 2015). He undoubtedly received a fair trial. Here, able counsel on both sides vigorously contested the case. The defendant was able to present his theory of the case to a jury of his peers. Defense counsel put the relevant question directly to the jury in his closing statement: "[t]*he only way you* convict Greg Davis of murder in the first degree is if you don't believe both of those doctors." (Emphasis added.) The jury didn't. I would respect the jury's verdict. *See Barany v. State*, 658 N.E.2d 60, 64 (Ind. 1995) (affirming jury's verdict where "the medical experts were unanimous in concluding that appellant was insane at the time of the killing" but "the State offered testimony from several lay witnesses that indicated that appellant was sane"). The State and the victim's family have an interest in finality. That interest should not be disturbed in the absence of a showing of a reasonable probability of a different result if the matter were retried. Davis has not made such a showing.

For these reasons, I would affirm the defendant's conviction. I respectfully dissent.

Mansfield and Oxley, JJ., join this dissent.